Nos. 22-0139 and 22-0140 – *Collingwood Appalachian Minerals III, LLC., et al. v. Richard L. Erlewine*

**FILED**

**June 15, 2023**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

Justice Hutchison, concurring, in part, and dissenting, in part:

This case involves separate tax deed conveyances in Wetzel County: the first are two 1991 tax deeds, and the second is a 1995 tax deed. As I explain herein, I concur with the majority opinion's ruling concerning the 1995 tax deed that conveyed a 25% share of the oil and gas royalties to Trio Petroleum and Waco Oil & Gas. But I dissent to the majority opinion's interpretation of Richard Erlewine's 1991 tax deed. I am firmly of the belief that Erlewine received a tax deed to the land undivided from a different 25% share of the oil and gas royalties in 1991, and thus, that the majority opinion's interpretation of the law of tax deeds is incorrect. Moreover, due to the ambiguities in the laws regarding tax deeds, particularly West Virginia Code § 11A-3-63, I call on the Legislature to clarify its statutes on this topic.

Any tax deed lawyer looking at the chain of title recorded in Wetzel County would fairly conclude that in 1945, Osburn Dunham bought 135 acres of land on Huff Ridge with a 25% share of the subjacent oil and gas from Joseph and Myrtle Rogers. In 1949, Dunham bought another 25% share from James Sivert. Hence, in 1968, when Dunham conveyed to Russell F. Stiles "the same land conveyed to the said Osburn Dunham by Joseph E. Rogers" in 1945, it is fair to say that Stiles purchased land with only a 25%

1

share of the oil and gas.[1]  Dunham continued to own a 25% share.  And if there is any confusion or ambiguity here, after 1968, Stiles paid taxes on 25% of the oil and gas and Dunham paid taxes on another 25% share.  While the majority opinion claims that the 1968 deed is unambiguous, it is actually Dunham's and Stiles subsequent conduct which clarified the intent behind the 1968 deed.  Hence, when Dunham defaulted and failed to pay his taxes, and the sheriff sold Dunham's 25% share to Trio/Waco (for a mere $16.36), the 1995 tax deed to Trio/Waco was unassailable.  Trio/Waco and its successors clearly own that 25% share under the 1995 tax deed.

That said, it is the other 25% share bought by Stiles in 1968 that is at the heart of my dissent.  There are several legal opinions in the record, known to every tax assessor in the State of West Virginia, which show that this case does not involve a procedural hiccup.  No, the assessor's actions in this case were in clear violation of West Virginia law.

It is a long-standing problem in West Virginia deed law that tax assessors have improperly and illegally sent landowners, who own a unified estate, multiple tickets taxing the estate in pieces.  Tax assessors, for a century, illegally split oil and gas, or coal, or whatever royalties or minerals from the surface estate and slapped a tax on each interest separately.  The result was multiple, improper assessments that caused confusion, the

---

[1] This analysis, obviously, sets aside any questions about the effect of the 1949 merger of Osburn Dunham's oil-and-gas shares.

duplication and overpayment of taxes, accidental defaults, and multiple overlapping and competing tax deeds following an auction of such interests.

The records of the Attorney General demonstrate that tax assessors botching the taxation of land, and illegally taxing the surface separate from the minerals, is nothing new. More importantly, those records demonstrate tax assessors knew those actions were illegal. For instance, nearly a century ago, in 1928, a landowner sold the coal underlying his tract of land in Harrison County and retained an undivided interest in the rest (the land and the non-coal minerals underlying the land). The tax assessor charged taxes to the landowner for "the surface" and the landowner paid the taxes. Then, oil and gas were discovered beneath the tract, and a prosecuting attorney questioned (on behalf of his county's tax assessor) whether the landowner had forfeited ownership of the oil and gas interest because the landowner never paid a separate tax on the oil and gas.

In a 1948, opinion, the Attorney General concluded the prosecuting attorney's question was balderdash. Specifically, the Attorney General found absolutely no authority for a tax assessor to split a landowner's undivided interest in land into pieces for tax purposes. The Attorney General said:

> Until there has been a severance of an estate in minerals there is no authority for a separate assessment of the mineral interest. Conversely there is no authority to omit from assessment an unsevered estate in minerals. . . . *There is no authority for the separate assessment of unsevered interests in land.* In the instant case therefore the owner and assessor must have intended to report for taxation the entire estate remaining after the severance of coal, including the unsevered interest in oil and gas.

3

Attorney General's Opinion of April 20, 1948, 42 W. Va. Op. Att'y Gen. 309 (1948) (emphasis added).

A similar question reappeared two decades later. In 1966, the Attorney General issued an opinion to Hardy County regarding land on which a well was producing natural gas. The natural gas was not severed from the land in the owner's deed, but the county assessor still issued two tax tickets to the owner: one for the land, and one for the natural gas royalties. Regarding those tax tickets, the Attorney General explained that West Virginia law – then, as now – requires an assessor to place one unified tax on "[t]he value of land, the value of buildings, and the aggregate value" of all tracts or interests. W. Va. Code § 11-4-2(5)(A). *See also* W. Va. Code § 11-4-9 (requiring the assessor to charge only one tax for an owner's undivided interest in any estate in land). Hence, the Attorney General concluded:

> Where land is owned and there has been no severance of an estate in the gas mineral from such land, but there is known natural gas within and underlying such land (regardless of whether or not gas royalties are being paid to the owner thereof pursuant to the terms of a lease), such land should be assessed annually for ad valorem taxation purposes at its "true and actual value", taking into consideration all pertinent indications of value, including, among any others, reliable estimates, gas production reports, and royalties paid to the landowner. *Until there has been a severance of an estate in the gas mineral, there is no authority for a separate assessment of the gas underlying such land.* There cannot be any separate assessment of unsevered interests in land.

Attorney General's Opinion of October 27, 1966, 52 W. Va. Op. Att'y Gen. 135 (1966) (emphasis added).

4

Accordingly, by 1966, it should have been clearly understood by county tax assessors across the State that if an interest in natural gas has not been severed from the land in a deed or will or other written conveyance, then there is no authority for the assessor to issue a separate tax assessment for the gas underlying the land.

Now, recall that two years later, in 1968, Osburn Dunham conveyed to Russell Stiles the same thing Dunham bought in 1945: "[a] tract of land situated on the Huff Ridge" with an undivided, unsevered, one-quarter share of the oil and gas royalties. Despite the repeated admonitions of the Attorney General, the Wetzel County tax assessor mailed Stiles two separate tax tickets, one for the land, and one for the share of oil and gas. This separate assessment had no basis in the law. Nevertheless, the Wetzel County assessor sent two separate tax tickets for the next two decades.

One might presume the assessor was confused, or that the likely changing of the guard caused a loss of institutional memory in Wetzel County. However, we have an opinion from the West Virginia State Tax Department that applies to this situation. In 1988, the Department wrote a letter to the assessor of Wetzel County encouraging the assessor to make "every effort" to repair his tax assessment books and to stop taxing mineral interests separately from undivided land interests. The Department pointed out that West Virginia Code § 11-4-2 prohibits a "separate assessment of unsevered interests in land." More importantly, the Department made clear to the assessor that the tax sale of a separate but unsevered mineral interest "would in all likelihood be considered invalid[.]"

Letter from Robert A. Hoffman, Director, Property Tax Division, State Tax Department of West Virginia, to Ralph E. Phillips, Assessor of Wetzel County (November 7, 1988).[2]

Hence, by 1988, the Wetzel County assessor's office was clearly on notice that it could not issue separate tax tickets on an unsevered, unified interest in land. Thus, the sale of an improper duplicate tax ticket, for an interest in minerals, would in all likelihood be considered invalid. Yet Russell Stiles continued to receive two tax tickets on his unified estate, and when he failed to pay those two tax tickets, Wetzel County's assessor and sheriff put both of those tickets up for sale. Plaintiff Richard Erlewine bought one ticket, and Trio/Waco bought the other, and those purchases resulted in the competing and confusing 1991 tax deeds at issue in this appeal.

Now, put yourself in Richard Erlewine's shoes in 1991 and ask, what did he think he was buying at the tax sale?[3] The majority opinion repeatedly says he bought the "property," but the record says otherwise. If Erlewine had researched the chain of title, he would not have seen the word "property" but, rather, would have seen the repeated use of

---

[2] The letter indicates carbon copies were sent to "All County Assessors" in the State of West Virginia.

[3] One question that might come to mind is whether Erlewine knew or should have known that two tax sales were occurring regarding the Huff Ridge land on the same day, and therefore "knew" that he was not buying the one-quarter oil-and-gas interest. There is no proof of that in the record. We know, today, that there were two overlapping sales because of the power of hindsight. Further, there is no duty in either the common law or the West Virginia Code that requires a tax purchaser of one unpaid tax ticket to research the other tax tickets being concurrently sold, to determine if the tax assessor has erred and created any duplication or overlap.

6

the word "land." For instance, he would have seen that, beginning in 1968, Stiles had title to "a tract of land situated on Huff Ridge" with an undivided interest in one-quarter of the oil and gas. If Erlewine saw an advertisement for the tax sale of Stiles's property and had looked in the county assessor's tax books, then he would have seen that Stiles owned 135 acres of land on Huff Ridge. When Erlewine paid the sheriff and assessor $6,000 for Stiles's unpaid taxes, the notices to redeem described the property as "Land – 135 Huff Ridge" and "135 acres of land on Huff Ridge." The 1991 tax deed to Erlewine said the same thing: he was "the purchaser of 135 acres of land on Huff Ridge."

My dissent, in part, is based on the majority opinion's avoidance of the word "land" and its clear meaning under West Virginia's tax laws, a meaning which undermines the majority opinion. The majority opinion repeatedly says that Erlewine only bought the "property," but that is incorrect. The numerous deeds and documents in the record say Erlewine bought "135 acres of *land*" at the tax sale. West Virginia Code § 11A-1-1 says that "[t]he words land or lands or tract or tracts of lands . . . shall be deemed to include an undivided interest in any freehold estate in land." Likewise, West Virginia Code § 11-4-9 says "the words land or lands or tract or tracts of lands . . . shall be read to include an undivided interest in land and an undivided interest in any estate in land[.]"

Hence, from Erlewine's perspective in 1991 when he received a tax deed to "135 acres of *land*," he could fairly believe that the tax assessor and sheriff followed the law, and believe he had purchased "an undivided interest in any freehold estate in land" or an "undivided interest in any estate in land" that had been owned by Stiles, and by Dunham,

7

and by Rogers. In other words, Erlewine could believe he bought an undivided interest in 135 acres of land and one-quarter of the oil and gas. When Erlewine brought his lawsuit, he could have fairly believed that he, and not Trio/Waco and its successors, owned at least a 25% share of the oil and gas. Therefore, the majority opinion avoided the legal definition of "land" by repeatedly invoking the term "property" to describe Erlewine's interest.

The majority opinion also makes much of the fact that Stiles failed to pay both tax tickets, and it uses that fact to differentiate this case from *Orville Young, LLC v. Bonacci*, 246 W. Va. 26, 866 S.E.2d 91 (2021), where one duplicate tax ticket was paid, and another was not. I do not think that fact is controlling because, as I detailed above, the law is clear that the tax assessor never should have split Stiles's undivided estate into two separate tax tickets for the two decades after 1968. However, despite the tax assessor's grievous violation of the law, the majority opinion ignores the rule applied in *Orville Young* that "[a] deed made pursuant to a tax sale under a void assessment is void." Syl. pt. 4, *Blair v. Freeburn Coal Corp.*, 163 W. Va. 23, 253 S.E.2d 547 (1979). I understand that, when Trio/Waco forked over $700 for its 1991 deed to "135A Huff Ridge OG ¼ Int." it believed it was buying a one-quarter share of the oil and gas royalties.[4] But the fact remains that Stiles's separate oil-and-gas interest should never have been on the tax assessor's

---

[4] Of the many odd facts in this case, the oddest is this: Stiles was charged $700 a year in taxes for a one-quarter share of the oil and gas interest, while Dunham was charged $16.36 for an identical one-quarter share.

8

books, and any tax sale under a void assessment is itself void. That is a legal fact and is why I am convinced that Trio/Waco bought nothing in 1991.

Clearly, Legislative action is needed because the majority opinion has overextended West Virginia Code § 11A-3-63 (1994) by interpretation.[5] That Code section, which I call § 63, excuses any procedural "irregularity, error or mistake" in the delivery of a tax deed, and then allows the original, taxpaying estate owner to bring an action to void the tax deed in limited circumstances.

What the majority opinion appears to miss here is that this case has nothing to do with the delivery of a tax deed; it instead involves a tax assessment that was improper and void from the get-go. This wasn't a procedural misstep; it was a violation of substantive law. For that matter, the majority opinion does not venture to guess what "procedure" means in § 63, it simply presumes that the issuance of illegal duplicate tax tickets for decades is a "step in the procedure leading up to and including delivery of the tax deed." *Id.* The majority opinion also misses that § 63 is designed to preserve "the due

---

[5] West Virginia Code § 11A-3-63 provides:

> No irregularity, error or mistake in respect to any step in the procedure leading up to and including delivery of the tax deed by the deputy commissioner shall invalidate the title acquired by the purchaser unless such irregularity, error or mistake is, by the provisions of section forty-nine of this article or section two, three, four or six, article four of this chapter, expressly made ground for instituting a suit to set aside the sale or the deed.

9

process rights of owners of real property," W.Va. Code § 11A-3-1, and it might also be designed to protect assessors and sheriffs from lawsuits by tax deed purchasers. But § 63 does not, and it cannot, limit the rights of the purchasers of conflicting tax deeds like Erlewine and Trio/Waco from suing to clarify the quality of their deeds. The assessor sold Trio/Waco something that was a legal fiction, but sold Erlewine something that had, as a matter of law, the appearance of being complete, undivided title. The majority opinion rewrites the 1991 deeds and chalks it up as nothing more than an irregularity, error, or mistake in the delivery of the two tax deeds. While the 1991 deed to Trio/Waco put a cloud on Erlewine's 1991 deed, the majority opinion interprets § 63 to say that Erlewine has no right to clear that cloud in a courtroom.[6]

Worse, let us take the majority opinion to its logical (but clearly wrong) conclusion. If the majority opinion is correct, Erlewine should never have filed this lawsuit. Instead, Erlewine should have put a cloud on Trio/Waco's tax deed by claiming his deed encompasses all of the oil and gas estate, and then commenced drilling on his 135 acres of land. Under the majority opinion's interpretation of § 63, Trio/Waco and its

_____

[6] To bring my concerns full circle, let me return to the *Orville Young v. Bonacci* case and this Court's inconsistent interpretation of § 63. Recall that in *Bonacci*, the majority opinion concluded that a lawsuit could be brought to interpret the meaning of a tax deed for a simple, factual reason: one of the two duplicate tax tickets had been paid. In the case at bar, the majority opinion says a case is precluded by § 63 because neither of the two duplicate tax tickets was paid. The majority opinion fails to explain what language in § 63 would permit the action in *Bonacci* but preclude the action in this case.

10

successors would have been prohibited from bringing a lawsuit to challenge Erlewine's interpretation of his tax deed.

I simply cannot believe that this is what the Legislature intended.

This case is all about public policy. The focus of any case interpreting deeds is on preserving the sanctity of titles and maintaining the stability of land transfers. The presumption should be that county tax assessors follow the law and assess a property based on its entire, undivided value. Courts should not permit assessors to violate the law, nor should courts be required to sanction those violations of law, yet that is what the majority opinion seems to suggest. I realize that it might not seem "fair" that an oil-and-gas company spent $700 for a tax deed to oil and gas that might now be worthless. But the policy question here is: who is the law going to protect? The sanctity of land titles and the notion that tax assessors comply with the law? Or, speculators who buy tax deeds to properties, sight unseen, gambling that the purchase might someday be worthwhile? Someone who buys "land" at a tax sale should be allowed to assume the law has been followed, and that the "land" encompasses the undivided estate of the prior owner who failed to pay their taxes. By permitting assessors to "get away" with double, triple, or quadruple assessments on land interests in violation of state law, the Court is encouraging gambling by tax purchasers. If the majority opinion had been decided differently and had applied the settled law that tax assessors are supposed to tax undivided interests in land only once, then buyers of tax liens would be motivated to investigate whether a purchase is void because it violates the law. Assessors would no longer be able to pawn off multiple

11

assessments to the same property interest, generating litigation between buyers, because there would be no more buyers of worthless tax liens. That said, it is for the Legislature to establish policy in such matters.

In sum, I respectfully dissent. I believe the circuit court correctly interpreted the 1991 tax deed as giving Erlewine the same interest as his predecessor, Stiles. Erlewine's 1991 tax deed conveyed to him a 100% interest in the land and all the minerals except for an undivided one-quarter interest in the oil and gas. The majority opinion, therefore, errs in holding otherwise, and I hope that the Legislature intervenes to clarify its intent as to how duplicate, unpaid tax deeds should be handled, by courts and counties, in the future.